# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| **J.T. HAND, individually and on behalf of all others similarly situated,** | |
| *Plaintiff*, | |
| **vs.** | Case No.:   **4:18-cv-668-NKL** |
| **BEACH ENTERTAINMENT KC, LLC d/b/a SHARK BAR,** 1340 Grand Boulevard, Kansas City, MO 64105 | **JURY TRIAL DEMANDED** |
| **THE CORDISH COMPANIES, INC.,** 601 E. Pratt Street, 6th Floor Baltimore, MD 21202 | |
| **ENTERTAINMENT CONSULTING INTERNATIONAL, LLC,** 601 E. Pratt Street, 6th Floor Baltimore, MD 21202 | |
| *Defendants*. | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff J.T. Hand, individually and on behalf of all others similarly situated, brings this action against Defendants Beach Entertainment KC, LLC d/b/a Shark Bar ("Shark Bar"), The Cordish Companies, Inc. ("Cordish"), and Entertainment Consulting International, LLC ("ECI") (Shark Bar, Cordish, and ECI are collectively referred to as "Defendants"). Plaintiff seeks redress for Defendants' practice of sending text messages to cellular telephone numbers in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq*. Plaintiff, for his Class Action Complaint, alleges the following based upon personal knowledge as to himself and his own acts and experiences, and as to all other matters, upon information and belief:

1.　　At all times relevant hereto, Plaintiff J.T. Hand has been a resident of Jackson County, Missouri.

2.　　Defendant Beach Entertainment KC, LLC d/b/a Shark Bar is a limited-liability company with its principal place of business at 1340 Grand Boulevard, Kansas City, Missouri 64105.

3.　　Defendant The Cordish Companies, Inc., is a Maryland corporation with its principal place of business at 601 E. Pratt Street, Baltimore, MD 21202.

4.　　Defendant Entertainment Consulting International, LLC is a Maryland limited liability company with its principal place of business at 601 E. Pratt Street, Baltimore, MD 21202.

5.　　Cordish and ECI effectuate and oversee all, or substantially all, of the advertising and/or marketing decisions of their venues, including Shark Bar. As described below, these venues are not independent ventures, but rather a direct extension of the Cordish brand itself, and have their day-to-day operations dictated by and through ECI, itself a division of Cordish.

6.　　The marketing decisions controlled by Cordish and ECI include, but are not limited to, (i) the collection of names and cellular telephone numbers of customers or prospective customers, (ii) the development of an Automated Telephone Dialing System ("ATDS") for sending text messages, and (iii) the use ATDS to send advertising and/or telemarketing text messages *en masse* to such cellular telephone numbers.

**JURISDICTION AND VENUE**

7.　　This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

8.　　This Court has personal jurisdiction over all Defendants and venue is proper in this

District pursuant to 28 U.S.C. § 1391(b)(2), because (i) Shark Bar's principal place of business is located in this District; (ii) Defendants have sent unlawful text messages to residents of this District—including to the cellular telephone numbers of Plaintiff and others with area codes specific to western Missouri;[1] (iii) Defendants transact significant amounts of business within this District, solicit customers here, direct telephone calls and text messages here, and enter into consumer and business contracts here; (iv) the tortious acts complained of herein arose and took place here and Plaintiff was first injured here; and (v) other substantial and relevant events and/or omissions related to Defendants' violations of the TCPA took place in this District.

9.  Defendants are separately created entities, however, each one is controlled by the same agents, officers, and/or directors.

10.  Defendants' affiliations with the state of Missouri are so "continuous and systematic" as to render them at home in this District, because Defendants' regular and systematic corporate decision-making is made in Kansas City, Missouri.

11.  Defendant Cordish admits to *owning and managing* several developments in

---

[1]  *See Lowe v. CVS Pharmacy, Inc.*, 233 F. Supp. 3d 636, 643 (N.D. Ill. 2017) (placing a call to a phone number with an Illinois-affiliated area code constitutes "purposeful direction" warranting the Court's exercise of jurisdiction) (*citing Keim v. ADF Midatlantic*, 199 F. Supp. 3d 1362, 1370 (S.D. Fl. 2016) (collecting cases)).

Case 4:18-cv-00668-NKL   Document 56   Filed 03/26/19   Page 3 of 31

Missouri, including the Power & Light District (Kansas City)[2] and Ballpark Village[3] (St. Louis).[4]/[5] In fact, Cordish expressly states that Kansas City Live, LLC (*i.e.*, Kansas City Power & Light District) and Defendant Beach Entertainment KC, LLC, among others, are its "subsidiary entities."[6] On information and belief, Defendant ECI exclusively provides services to each of these Missouri owned establishments.

12.     Additionally, as evidenced by its Missouri "Application for Registration," File Number FL1321893, which was executed by Reed Cordish, ECI has been registered to do business in Missouri since 2006.

### NATURE OF THE ACTION

13.     The Kansas City Power & Light District is an entertainment establishment located in downtown Kansas City. Shark Bar is a drinking establishment located within the Kansas City

---

[2]     *Kansas City Power & Light District*, http://cordish.com/portfolio/power-and-light-district ("The Kansas City Power & Light District is a dynamic, nine-city block retail, entertainment, office and residential district, located in the heart of downtown Kansas City directly adjacent to the 21,000-seat Sprint Center Arena. Widely recognized as one of the most exciting urban developments in the country, the $850 million Power & Light District has been the cornerstone of a $5 billion urban renaissance for Kansas City, which includes a new performing arts venue, arena, convention center expansion and 10,000 new urban residential units.").

[3]     *Ballpark Village*, http://cordish.com/portfolio/ballpark-village ("Ballpark Village is a mixed-use retail, entertainment, office and residential district in St. Louis, Missouri, developed in partnership with the St. Louis Cardinals. Spanning seven city blocks directly adjacent to and integrated with the Cardinals' Busch Stadium, Ballpark Village was the country's first fully integrated mixed-use development designed to deliver the excitement and energy of the game-day experience outside the stadium walls.... Planning and development for Phase 2 of Ballpark Village is currently underway. The $260 million, 700,000 square foot project will include a Live! by Loews hotel, a 29-story high-rise luxury residential tower, the first Class-A office building in downtown St. Louis in nearly thirty years, and additional retail, restaurant and entertainment space.")

[4]     *The Cordish Companies – About,* http://cordish.com/about (last visited Dec. 11, 2018).

[5]     *Virginia Beach Multi-Venue Entertainment Development, Solicitation RFQ No. 1-2017*, pages 75-77, https://www.yesvirginiabeach.com/resources/special-projects/Documents/RFP/Dome%20Site%202017/Cordish.pdf (last visited Dec. 12, 2018).

[6]     *See* Cordish's January 29, 2009 "Power of Attorney", attached to Kansas City Live Block 126 Entertainment, LLC's "Statement of Change of Registered Agent and/or Registered Office", filed with the Missouri Secretary of State on March 27, 2009, File Number FL0692311.

-4-

Power & Light District.

14.    Shark Bar is a fictitious name utilized by Cordish and ECI, which have exclusive and complete control over the actual operation of this venue and others like it. This control extends directly to Shark Bar's marketing and promotion.

15.    Between April 25, 2014 and April 4, 2018, Defendants caused text messages to be sent to the cellular telephones of Plaintiff and the putative Class members in violation of the TCPA. Defendants sent these messages for the purposes of advertising and marketing Shark Bar's products and services, to increase their revenue and expand their customer base.

16.    Specifically, Defendants (either directly or through a third-party telemarketer) sent unsolicited text messages to the cellular telephones of Plaintiff and the putative Class members promoting specials and events at Shark Bar and encouraging Plaintiff and the putative Class members to visit Shark Bar with their friends.

17.    By sending the text messages alleged in this Complaint, Defendants have caused Plaintiff and the putative Class members (as defined herein) actual harm.

18.    On information and belief, Defendants routinely sent, and continue to send, the text messages despite the fact that Plaintiff and the putative Class members:

> (a)    never provided prior express consent in writing, or otherwise, for Defendants to send advertising or telemarketing text messages to their cellular telephone numbers; and/or
>
> (b)    never provided prior express consent in writing, or otherwise, for Defendants to send text messages to their cellular telephone numbers using an automatic telephone dialing system (as defined by the TCPA).

19.    Defendants also sent the advertising text messages to Plaintiff and other putative

Class members even though (i) Defendants failed to establish written policies and procedures to ensure compliance with the national and/or internal do-not-call rules and regulations, and failed to train their staff in compliance with such policies and procedures, (ii) Plaintiff and other putative Class members have registered their telephone numbers on the national do-not-call registry, and/or (iii) after Defendants had been requested to stop sending such text messages to Plaintiff and other putative Class members.

20.     Plaintiff, on his own behalf and on behalf of all others similarly situated, brings this lawsuit for an injunction requiring Defendants to cease all unsolicited text message activities and for an award of statutory damages to Plaintiff and members of the putative Class under the TCPA.

### THE TELEPHONE CONSUMER PROTECTION ACT OF 1991
### 47 U.S.C. § 227, *et seq.*

21.     Advancements in telephone dialing technology since the 1980s and 1990s have made reaching a large number of consumers by telephone easier and more cost-effective. This technology, however, has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money.

22.     Senator Ernest Hollings, sponsor of the TCPA, described such marketing practices as "the scourge of modern civilization, they wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30, 821 (1990).

23.     The FCC recently noted, "every month, U.S. consumers are bombarded by an estimated 2.4 billion robocalls." *In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls*, Notice of Proposed Rulemaking, Statement of Chairman Pai, 32 FCC Rcd. 2306, 2331 (2017) (emphasis added). That number has since increased to an estimated 2.5 billion

robocalls per month as of October 2017.[7]

24.     In response to these unwanted telephone calls, text messages, and junk faxes, the federal government and numerous states have enacted legislation to combat these widespread telemarketing abuses. As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers. … *Banning such automated or prerecorded telephone calls* to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, *is the only effective means of protecting telephone consumers from this nuisance and privacy invasion*.

Pub. L. No. 102-243 §§ 2(6) & (12) (1991), *codified at* 47 U.S.C. § 227 (emphasis added).[8]

25.     As is relevant here, the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service, …" 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(1).

26.     For purposes of the TCPA, "[a] text message to a cellular telephone … qualif[ies] as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct.

---

[7]    *See In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls*, Report and Order and Further Notice of Proposed Rulemaking, Statements of Commissioners Clyburn and Rosenworcel, 32 FCC Rcd. 9706, 9756 & 9759 (2017).

[8]    *See also Zean v. Fairview Health Servs.*, 858 F.3d 520, 522-23 (8th Cir. 2017) ("Recognizing that automated calls are often a nuisance and an invasion of privacy, Congress passed the TCPA to balance individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade.") (internal citations and quotation marks omitted); *Susinno v. Work Out World*, 862 F.3d 346, 352 (3rd Cir. 2017) ("'[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients'. . .") (quoting *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017)).

663, 667 (2016) (citation omitted).[9]

27.     "Automatic telephone dialing system" ("ATDS") refers to any equipment that has the "capacity to dial numbers without human intervention[.]" *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 726 (N.D. Ill. 2011) (citing *In re Rules & Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14014, 14092, ¶ 132 (2003) ("2003 TCPA Order")).

28.     In 2012, the FCC—the agency tasked with promulgating the implementing regulations of the TCPA—revised its TCPA rules to require *prior express written consent* before initiating a telephone call "that includes or introduces an advertisement or constitutes telemarketing[.]" 47 C.F.R. § 64.1200(a)(2); *In re Joint Petition filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6589, ¶ 37 & fn. 113 (2013) ("Dish Network Ruling").

29.     According to FCC regulations, "*prior express consent*" must (i) be in writing; (ii) be signed by the person providing the consent; (iii) clearly authorize the calling party to use an ATDS or artificial or pre-recorded voice; (iv) specify the telephone number to which the person is consenting to be called; and (v) not be a condition of purchasing any goods or services. *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, FCC Report and Order, 27 FCC Rcd. 1830, 1843, ¶ 32 (2012) ("2012 TCPA Order").

30.     In 2003, the FCC adopted a national do-not-call registry to provide consumers with an option to prohibit unwanted telemarketing solicitations. *2003 TCPA Order* at 14034-35, ¶ 28.

31.     The FCC rules also prohibit any person or entity from initiating a telemarketing solicitation to any "residential telephone subscriber who has registered his or her telephone number

---

[9]     *See also In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Order, 30 FCC Rcd. 12484, 12485, ¶ 3 (2016) (the TCPA's prohibition on robocalls "encompasses both voice and text calls, including short message service (SMS) calls and text calls and text calls made using Internet-to-phone technology . . .").

on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). For purposes of this provision of the TCPA, wireless subscribers who are registered on the national do-not-call list are presumed to be "residential subscribers." *2003 TCPA Order* at 14038-39, ¶ 36.

32. The FCC rules also require telemarketers to maintain a company-specific internal do-not-call list, to immediately record a consumer's do-not-call request, and to cease any further telemarketing calls within thirty days of such request. 47 C.F.R. § 64.1200(d)(3).

33. The FCC's regulations define "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1). Whether a call is an "advertisement" depends on the content of the material. *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

34. "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). The "telemarketing" inquiry focuses on the purpose of the telephone call or message, rather than its content. *Golan*, 788 F.3d at 820.

35. The FCC has also made rulings regarding the TCPA's vicarious liability standards as they relate to telemarketing. As early as 1995, the FCC stated that "[c]alls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call." *In re Rules and Regulations Implementing the TCPA of 1991*, 10 FCC Rcd. 12391, 12397 (1995).

36. The FCC has also clarified that vicarious liability is imposed under federal common law principles of agency for violations of either sections 227(b) or (c) that are committed by third-party telemarketers. *Dish Network Ruling* at 6580 & ¶ 18.

37.     The TCPA provides for injunctive relief and the greater of actual damages or $500 per violation, which may be trebled where Defendants' conduct was done willfully or knowingly. 47 U.S.C. §§ 227(b)(3) and (c)(5).

<u>FACTUAL ALLEGATIONS COMMON TO ALL COUNTS</u>

38.     Cordish is a privately-held commercial real estate developer. Cordish builds co-working spaces, entertainment districts, gaming, hotels, restaurants, and sports-anchored developments. Cordish owns over 50 restaurants, bars, and live music venues around the country. According to its website, "[t]he Cordish Companies still *owns and manages* virtually every business it has created."[10] (Emphasis added).

39.     In a "Request for Qualification" filed by Cordish with the Virginia Beach Development Authority on April 6, 2017, Cordish provided a list of "Developments Owned and Managed." Among the developments listed is "Power & Light District, Kansas City, MO – Mixed-Use/Live Entertainment."[11]

40.     To retain exclusive and complete control over its bar and restaurant developments, Cordish established an internal Entertainment Management Division in 1994, which it assigned the name Entertainment Consulting International ("ECI"). While ECI publicly holds itself out as providing services to a variety of clients in the hospitality business, on information and belief, it exclusively provides services to Cordish-owned establishments.

---

[10]     *The Cordish Companies – About,* http://cordish.com/about (last visited Dec. 11, 2018).

[11]     *Virginia Beach Multi-Venue Entertainment Development, Solicitation RFQ No. 1-2017*, pages 75-77, https://www.yesvirginiabeach.com/resources/special-projects/Documents/RFP/Dome%20Site%202017/Cordish.pdf (last visited Dec. 12, 2018).



**1994**

The Entertainment Management division, Entertainment Consulting International, LLC (ECI) is established.

<u>(Figure 1, showing a portion of a timeline from "About Cordish Companies").</u>[12]

41.     As such, ECI is not an independent company, but rather part and parcel of Cordish itself.  Cordish uses its Entertainment Management Division (*i.e.*, ECI), along with numerous holding corporations or "subsidiary entities," such as Kansas City Live, LLC to develop, implement, manage, and operate multiple entertainment districts (and dozens of bars and restaurants within those districts) across the country, including Shark Bar.

42.     For instance, the LinkedIn profile of Jake Miller, Senior Vice President of ECI, states that he is "Currently managing over 40 bars and restaurants [including] in … Kansas City, …"[13] The LinkedIn profile of Ashley (Miller) St. Pierre, Director of Marketing of ECI, states that "ECI operates premier dining and entertainment districts including … The Power & Light District

---

[12]     *The Cordish Companies – About,* http://cordish.com/about (last visited Dec. 11, 2018).

[13]     https://www.linkedin.com/in/jake-miller-284bb238/ (last visited Dec. 12, 2018).

(Kansas City, MO), …"[14] Likewise, the LinkedIn profile of Dayna Wilde, who worked as former Sales Building Director of ECI from Dec 2011 through May 2013, provides that Ms. Wilde's job duties were as follows:

> … develop and implement sales building programs for multiple entertainment concepts. Train and manage a team of 35 sales managers and coordinators to increase sales in over 30 bar/restaurant/nightclub concepts across 6 entertainment districts. …[15]

43.     Among the suite of services that ECI coordinates and directs for all Cordish bars and restaurants, including Shark Bar, is the ability to mass text message potential customers. Indeed, Cordish, through ECI, is able to provide these mobile marketing services by owning and operating the "TXT Live! SMS Platform," which, as shown in <u>Figure 2</u>, is self-proclaimed by Cordish as being one of its "assets."

---

[14]     https://www.linkedin.com/in/ashleymiller3/ (last visited Dec. 12, 2018).

[15]     https://www.linkedin.com/in/dayna-wilde-444a1614/ (last visited Dec. 12, 2018).



(Figure 2, showing The Cordish Companies' assets).[16]

44.     To access the text messaging portal, Defendants' employees visit the "ECI Contact App" by navigating to the URL "https://txt.live" or "https://ecisms.com," which both exist on the same server. Once logged in, Defendants' employees upload CSV files containing consumers' cell phone numbers, and create and sent promotional text message campaigns.

45.     The ECI Contact App website reveals source code with instructions and a FAQ section for Defendants' employees explaining how to use the text messaging platform. For instance, in response to "How do I create a new contact(s)?" the ECI Contact App states that users "can select 'Add New Contact' or 'Import CSV' and follow instructions from there." And, in

---

[16]     *Entertainment Consulting International, LLC – Services / Sales & Marketing*, http://ecimgt.com/services ("Corporate national sales team to support unit level sales associates including: access to database management software … [including] Mobile marketing …") (last visited Dec. 12, 2018).

response to "How do I start a new campaign," the ECI Contact App states, "Near the top right corner of the blue section, you'll see a 'New Campaign' button. Click this, select a group(s) you want to campaign to, adjust filters, click 'Apply Filters' and type the text you want to send."[17]

46.     As such, ECI developed the policies and procedures for creating text messaging campaigns and collecting lists of consumers' names and phone numbers for use in telemarketing campaigns.

47.     Most importantly, Cordish played a part in bringing the ECI Contact App online. Aside from listing TXT Live! as one of its primary assets, Cordish owns the domain names associated with the text messaging platform. In fact, Cordish's Director of Information Services, Paul Weil, registered the "txt.live" domain name by using an official Cordish email address and Cordish's mailing address in Baltimore, Maryland. Paul Weil also registered the "cordish.com" domain name by providing the same Cordish email address and company address.

48.     Between April 25, 2014 to April 4, 2018, Defendants and/or their agents utilized the ECI Connect App (*i.e.*, TXT Live!) to send text messages to the cellular telephone numbers of Plaintiff and the putative Class members for the purpose of promoting Shark Bar.

49.     Specifically, the hardware and software used by Defendants and/or their agents had the capacity to generate and store random numbers, or store lists of telephone numbers, and to dial those numbers, *en masse*, in an automated fashion without human intervention.

50.     Plaintiff and the putative Class never provided prior express consent, in writing or otherwise, for Defendants to send autodialed, advertising, telemarketing text messages, and/or any other communication to their cellular telephone numbers.

51.     When Defendants obtain the cellular telephone number of a consumer or business,

---

[17]     *See* https://txt.live/users/sign_in

they add them to a stored list of numbers to which Defendants and/or their agents repeatedly send autodialed, advertising, and/or telemarketing text messages.

52.     Defendants' text messages are sent with equipment having the capacity to dial telephone numbers without human intervention, the equipment is unattended by human beings, and the equipment does, in fact, send text messages automatically, *i.e.*, without human intervention.

53.     The equipment employed by Defendants and/or their agents not only have the capacity to store or produce telephone numbers to be called using a random or sequential number generator (and to dial such numbers), but was programmed to sequentially or randomly access stored telephone numbers to automatically send text messages to those numbers.

54.     The text messages sent by Defendants to Plaintiff and the putative Class were made for a commercial purpose in that they contain the brand name and location of Shark Bar, they promote specials and events at Shark Bar, and/or they encourage Plaintiff and the putative class members to visit Shark Bar with their friends or associates.

55.     Defendants' text messages are advertisements and/or constitute telemarketing as defined by the TCPA.  *See* 47 U.S.C. § 227(a); *Golan*, 788 F.3d at 820.

56.     Not only do Defendants fail to obtain prior express consent before sending such text messages, Defendants do not provide a way of opting out of future text messages.

57.     Defendants sent such telemarketing text messages without first establishing written policies or procedures to ensure compliance with the national and/or internal do-not-call rules and regulations, as required by 47 C.F.R. § 64.1200(d), and Defendants failed to train their staff in

compliance with such policies and procedures.[18]

58.     Defendants sent these unsolicited text messages to Plaintiff and other putative class members' cellular telephone numbers who have their telephone numbers registered with the national do-not-call registry and/or who have requested that Defendants stop sending such text messages.

59.     On information and belief, many of Defendants' text messages were sent within 12 months of one or more prior text messages, and Defendants lack an adequate system for preventing the transmission of numerous automated text messages to the same telephone number.

60.     Defendants are aware that the above-described text messages are being sent to consumers and businesses without their prior express consent, to consumers and businesses who have registered their phone numbers on the do-not-call registry, and/or to consumers and businesses who have expressly requested that Defendants stop sending such text messages, but Defendants willfully continue to send them anyway.

61.     Plaintiff and the putative Class members have been substantially damaged by Defendants' repeated text messages.[19]  Plaintiff and the putative Class members' privacy was invaded; they were annoyed and inconvenienced; the repeated text messages intruded upon their seclusion and interfered with the exclusive use of their property; they were charged out of pocket

---

[18]     On May 21, 2018, Plaintiffs requested that Defendants provide their attorneys with a copy of any written policies and procedures that Defendants had established and implemented and/or instituted as of (1) August 1, 2014, (2) February 13, 2018, and (3) April 4, 2018, to ensure compliance with the TCPA, but Defendants failed to produce any such policies and procedures.

[19]     *See Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (allegations of "[u]nsolicited phone calls or text messages … invade the privacy and disturb the solitude of their recipients" and are sufficient to confer Article III standing); *Susinno v. Work Out World Inc*., 862 F.3d 346 (3rd Cir. 2017) (same); *Williams v. Zounds Music, L.L.C*., No. 16-cv-940 (W.D. Mo. Feb. 28, 2017) (same) (*citing Van Patten*); *Hunsinger v. Gordmans, Inc*., No. 16-cv-162, 2016 WL 7048895 (E.D. Mo. Dec. 5, 2016) (same).

cellular airtime minutes for the text messages and cellular data for services related to the text message content;[20] the ATDS calls intruded upon and occupied the capacity of the cellular phones of Plaintiff and the Class members, depleted and/or reduced the lifespan of their cellular phone batteries,[21] caused Plaintiff and the Class members to incur the costs of electricity to recharge their phones;[22] and, on information and belief, Defendants' repeated text messages have caused unwanted use, damage and/or depletion of their property, including, but not limited to, a reduction in the lifespan of their LCD screens, speakers, vibration motors, and other hardware and/or electronic components.

## FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF J.T. HAND

62. At all times relevant hereto, Plaintiff Hand has paid a third-party provider for cellular telephone service and cellular data service on his personal cellular telephone, which has an area code specific to western Missouri, ending in "6900".

63. Plaintiff Hand never gave his cellular telephone number to Shark Bar, and never provided Shark Bar with prior express consent, written or otherwise, to send autodialed,

---

[20]   *See In re Rules Implementing the Tel. Consumer Prot. Act of* 1991, 23 FCC Red. 559, 562, ¶ 7 (2008) ("[W]ireless customers are charged for incoming calls whether they pay in advance or after the minutes are used."); *see also Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012) (recipients are damaged because they are charged "out of pocket" cellular airtime minutes); *Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 729 (S.D. Tx. 2012) (Plaintiff's statement that he pays a third-party provider for cellular phone services is sufficient to show that an individual was charged for the calls); *Warnick v. Dish Network LLC*, No. 12-cv-01952 (D. Co. Sep. 30, 2014) ("[U]sers of cellular telephone numbers *are indeed charged* for incoming calls, regardless of whether they incur any *additional* charges for such calls.").

[21]   *See e.g.*, Apple Inc., *Battery Servicing and Recycling*, http://www.apple.com/batteries/service-and-recycling ("All rechargeable batteries have a limited lifespan … Your own battery's lifespan will vary depending on how you use your device …").

[22]   *See Mey v. Got Warranty, supra fn. 2*, 193 F. Supp. 3d at 645-47 (Intangible harms include "intrusion upon and occupation of the plaintiff's cell phone. … [and] intrusion upon another person's computerized electronic equipment …" Tangible harms, including the cost of electricity, "[w]hile certainly small, [are] real, and the cumulative effect could be consequential.").

-17-

advertising, and/or telemarketing text messages to his cellular telephone number.

64.     On multiple occasions, with the most recent message occurring on December 14, 2017, Defendants and/or their agents caused text messages to be sent, automatically and without human intervention, to Plaintiff Hand's cell phone using an ATDS.

65.     The text messages contained Shark Bar's brand name and location, promoted specials and events at Shark Bar, and/or encouraged Plaintiff Hand to visit Shark Bar with his friends or associates.

66.     The text messages sent by Defendants to Plaintiff Hand were made for a commercial purpose and are advertisements and/or constitute telemarketing as defined by the TCPA.

67.     Defendants did not provide Plaintiff and the Class members with notice that they intended to send multiple autodialed, advertising, and/or telemarketing text messages to their cellular telephone numbers.

68.     Plaintiff and the Class members never provided prior express consent in writing, or otherwise, for Defendants to send such text messages to their cell phones by using an ATDS.

69.     On at least one occasion, years ago, Plaintiff Hand responded to Defendants' text messages by texting the word "STOP," however, Defendants refused to honor Plaintiff's request to stop sending him text messages.

70.     On June 7, 2012, Plaintiff registered his wireless number ending in 6900 with the national do-not-call registry and received confirmation that his registration would be effective as of July 8, 2012.

71.     Since the effective date of Plaintiff's registration on the national do-not-call list and between April 25, 2014 and April 4, 2018, Defendants have sent numerous advertising and/or

telemarketing text messages to Plaintiff, many of which were within 12 months of one or more prior text messages.

<u>CLASS ACTION ALLEGATIONS</u>

72.     Plaintiff restates and incorporates by reference all paragraphs of this Complaint, including all subparagraphs thereof.

73.     As to Count I for violation of the TCPA (the "227(b)(1)(A)(iii) Class"), Plaintiff brings this action on behalf of himself and on behalf of a putative Class defined as:

> All persons and entities within the United States to whom Defendants (or a third party acting on Defendants' behalf) (1) sent a text message; (2) to his or her cellular telephone number; (3) that promoted Shark Bar; (4) between April 25, 2014 to April 4, 2018.

74.     As to Count II for violation of the TCPA (the "64.1200(d) Class"), Plaintiff brings this action on behalf of himself and on behalf of a putative Class defined as:

> All persons and entities within the United States to whom Defendants (or a third party acting on Defendants' behalf) (1) sent more than one text message; (2) to his or her cellular telephone number; (3) that promoted Shark Bar; (4) between April 25, 2014 to April 4, 2018; and (5) within any twelve-month period.

75.     As to Count III for violation of the TCPA (the "227(c) Class"), Plaintiff brings this action on behalf of himself and on behalf of a putative Class defined as:

> All persons and entities within the United States (1) whose cellular telephone number had been registered with the National Do-Not-Call Registry; and to whom Defendants (or a third party acting on Defendants' behalf) (2) sent more than one text message; (3) to his or her cellular telephone number; (4) that promoted Shark Bar; (5) between April 25, 2014 to April 4, 2018; and (6) within any twelve-month period.

76.     As to Count IV for violation of the TCPA (the "64.1200(d)(3) Class"), Plaintiff brings this action on behalf of himself and on behalf of a putative Class defined as:

> All persons and entities within the United States to whom

Defendants (or a third party acting on Defendants' behalf) (1) sent a
text message; (2) to his or her cellular telephone number; (3) that
promoted Shark Bar; (4) between April 25, 2014 to April 4, 2018;
(5) after Defendants had been requested to stop.

77.     The following people are excluded from the Classes: (1) any judge or magistrate

presiding over this action and members of their families; (2) Defendant, its subsidiaries, parents,

successors, predecessors, and any entity in which Defendants or its parents have a controlling

interest and its current or former employees, officers and directors; (3) persons who properly

execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this

matter have been finally adjudicated on the merits or otherwise released; (5) the parties' counsel;

and (6) the legal representatives, successors, and assigns of any such excluded persons.

78.     **Numerosity – Fed. R. Civ. P. 23(a)(1).**  Plaintiff does not know how many

members are in the putative Classes but believes them to be in the tens of thousands, if not more.

On information and belief, the number of class members is so numerous that their individual

joinder is impracticable.  The precise number of putative Class members and their phone numbers

can be obtained from information and records in the possession and control of Defendants or third

parties acting on Defendants' behalf.

79.     **Existence and Predominance of Common Questions of Law and Fact – Fed. R.**

**Civ. P. 23(a)(2) & 23(b)(3).**  Common questions of law or fact exist as to all members within the

putative Classes and predominate over any questions solely affecting any individual member.  The

predominating common legal and factual questions, each of which may also be certified under

Fed. R. Civ. P. 23(c)(4), include the following:

    (a)     Whether Defendants and/or their agents used an ATDS to send text
             messages;

    (b)     Whether the equipment used by Defendants, or a third party on Defendants'

behalf, has the capacity to send text messages automatically, *i.e.*, without human intervention;

(c)     Whether Defendants' text messages are advertisements;

(d)     Whether Defendants' text messages constitute telemarketing;

(e)     Whether Defendants advised Plaintiff and the Class members that they intended to send autodialed, advertising, and/or telemarketing text messages to their cellular telephone numbers;

(f)     Whether Defendants obtained prior express consent, written or otherwise, to send autodialed, advertising, and/or telemarketing text messages to the cellular telephone numbers of Plaintiff and the Class members;

(g)     Whether Defendants' text messages were sent for an emergency purpose;

(h)     Whether Defendants' text messages were sent willfully or knowingly;

(i)     Whether Defendants (i) established and implemented written procedures to comply with the national do-not-call rules; (ii) trained their personnel in procedures established pursuant to the national do-not-call rules; (iii) maintained a list of telephone numbers Defendants may not contact; (iv) employed a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call or text is made; and (v) maintained records documenting this process;

(j)     Whether Defendants (i) established and implemented written procedures to comply with the internal do-not-call rules; (ii) trained their personnel in procedures established pursuant to the internal do-not-call rules; (iii) maintained an internal list of telephone numbers Defendants may not

contact; (iv) employed a version of the internal do-not-call list containing numbers updated no more than 30 days prior to the date any call is made; and (v) maintained records documenting this process; and/or

(k)     Whether, and to what extent, members of the Classes are entitled to equitable relief, including declaratory relief, a preliminary injunction, and/or permanent injunction.

80.     **Typicality – Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of the claims of the putative Classes he seeks to represent.  The factual and legal bases of Defendants' liability to Plaintiff is the same for all putative class members: (i) Defendants violated the TCPA by using an ATDS to send text messages without obtaining prior express written consent in writing or otherwise; and (ii) Defendants violated the TCPA by sending multiple promotional text messages without complying with the requirements of 47 C.F.R. § 64.1200(d) and/or 47 U.S.C. § 227(c).

81.     **Adequacy of Representation – Fed. R. Civ. P. 23(a)(4).**  Plaintiff will fairly and adequately protect the interests of the putative Class members. Plaintiff has no interests that might conflict with the interests of the putative Class members. Plaintiff will pursue the claims vigorously, and Plaintiff has retained competent counsel experienced in TCPA class actions and complex litigation.

82.     **Superiority – Fed. R. Civ. P. 23(b)(3).**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Class members to obtain effective redress on an individual basis for the wrongs done to them. Furthermore, even if Class members could afford such individualized

litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

## COUNT I
### VIOLATIONS OF THE TCPA, 47 U.S.C. § 227(b)(1)(A)(iii)

83.     Plaintiff restates and incorporates by reference all paragraphs of this Complaint, including all subparagraphs thereof.

84.     Defendants and/or their agents employed an ATDS to send non-emergency text messages, automatically and without human intervention, to the cellular or wireless telephones of Plaintiff and the members of 227(b)(1)(A)(iii) Class.

85.     Defendants never obtained prior express consent in writing, or otherwise, advising Plaintiff or the members of the 227(b)(1)(A)(iii) Class that they intended to send autodialed, advertising, and/or telemarketing text messages to their cellular or wireless telephones.

86.     As a result of Defendants' conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and the 227(b)(1)(A)(iii) Class were harmed and are entitled to a minimum of $500 in damages for each unlawful text message.

87.     Plaintiff and the 227(b)(1)(A)(iii) Class are also entitled to an injunction against future calls. 47 U.S.C. § 227(b)(3).

88.     Defendants' text messages were willful and knowing, in that Defendants knew they were obtaining and storing cellular telephone numbers and employing equipment that would send autodialed, advertising, and/or telemarketing text messages to such numbers; Defendants intended

that such equipment would in fact send automated text messages containing Shark Bar's brand name and location, and promoting specials and events at Shark Bar; and Defendants knew that they had not obtained prior express consent in writing, or otherwise, from Plaintiff or any of the putative class members to send such text messages.

89. "Willful … means that the violator knew that he was doing the act in question. … A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance." *In re Dynasty Mtg., L.L.C.*, 22 FCC Rcd. 9453, 9470 & fn. 86 (May 14, 2007) (citations omitted).

90. Because Defendants' misconduct was willful and knowing, the Court should treble the amount of statutory damages recoverable by Plaintiff and the putative Class members.

**C<span>OUNT</span> II**
**V<span>IOLATIONS OF THE</span> TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)**

91. Plaintiff restates and incorporates by reference all paragraphs of this Complaint, including all subparagraphs thereof.

92. Defendants' text messages were made for a commercial purpose in that they contain the brand name and location of Shark Bar, they promote specials and events at Shark Bar, and/or they encourage Plaintiff and the putative Class members to visit Shark Bar with their friends or associates.

93. Defendants sent more than one advertising and/or telemarketing text message within any twelve-month period to Plaintiff and the 64.1200(d) Class even though Defendants did not first institute procedures for initiating telemarketing calls or text messages that meet (or exceed) the following minimum standards:

- Written policies and procedures, available upon demand, for maintaining a do-not-call list;

- Policies and procedures for the training of personnel engaged in any aspect of telemarketing, on the existence and use of the do-not-call list;

- Policies and procedures for the recording of any request not to receive calls, at the time the request is made, including the subscriber's name, if provided, and telephone number, and honoring any such requests within a reasonable time from the date such request is made.

- Policies and procedures for employing a version of the internal do-not-call list containing numbers updated no more than 30 days prior to the date any call is made;

- Policies and procedures for providing the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted; and

- Policies and procedures for maintaining records documenting this process, for a period of not less than 5 years.

94. On information and belief, Defendants are not tax-exempt nonprofit organizations and are therefore required to comply with the minimum standards set forth in 47 C.F.R. § 64.1200(d). *See* 47 C.F.R. § 64.1200(d)(7).

95. On information and belief, Defendants did not implement any of the minimum standards required by 47 C.F.R. § 1200(d)(1)-(6).

96. Defendants' text messages do not sufficiently identify the name of the individual caller, and do not provide a (working) telephone number[23] or address at which the person or entity may be contacted.

97. As a result of Defendants' conduct and pursuant to Section 227(c)(5) of the TCPA,

---

[23] Defendants' text messages do not provide a telephone number, toll-free or otherwise, for consumers and businesses to call in order to opt out of future text messages. Additionally, if you call the telephone number Defendants used to send a text message to Plaintiff's cellular telephone number on December 14, 2017, you are greeted with a message that states: "We're sorry, you've reached a telephone number that has been disconnected or is no longer in service. If you feel you have reached this recording in error, please check the number and try your call again."

Plaintiff and the 64.1200(d) Class were harmed and are entitled to a minimum of $500 in damages for each unlawful text message.

98.    Plaintiff and the 64.1200(d) Class are also entitled to an injunction against future calls.  47 U.S.C. § 227(c)(5).

99.    Defendants' text messages were willful and knowing, in that Defendants knew they were sending advertising and/or telemarketing text messages to the cellular telephone numbers of Plaintiff and the Class members without first implementing procedures required by 47 C.F.R. § 64.1200(d), but Defendants chose to send such text messages anyways.

100.    "Willful … means that the violator knew that he was doing the act in question. . . . A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance."  *In re Dynasty Mtg*., *L.L.C*., 22 FCC Rcd. 9453, 9470 & fn. 86 (May 14, 2007) (citations omitted).

101.    Because Defendants' misconduct was willful and knowing, the Court should treble the amount of statutory damages recoverable by Plaintiff and the putative Class members.

<u>**COUNT III**</u>
**VIOLATIONS OF THE TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2)**

102.    Plaintiff restates and incorporates by reference all paragraphs of this Complaint, including all subparagraphs thereof.

103.    Defendants' text messages were made for a commercial purpose in that they contain the brand name and location of Shark Bar, they promote specials and events at Shark Bar, and/or they encourage Plaintiff and the putative class members to visit Shark Bar with their friends or associates.

104.    Defendants sent more than one advertising and/or telemarketing text message within any twelve-month period to Plaintiff and the 227(c) Class after their telephone numbers had

been registered on the national do-not-call registry for more than 31 days.

105.     These advertising and/or telemarketing text messages were made even though Defendants did not obtain prior express consent in writing, or otherwise, to send such text messages to Plaintiff or the 227(c) Class.

106.     As a result of Defendants' conduct and pursuant to Section 227(c)(5) of the TCPA, Plaintiff and the 227(c) Class were harmed and are entitled to $500 in damages for each violation.

107.     Plaintiff and the 227(c) Class are also entitled to an injunction against future calls. 47 U.S.C. § 227(c)(5).

108.     On information and belief, Defendants failed to (i) institute written procedures to comply with the national do-not-call rules; (ii) train their personnel in procedures established pursuant to the national do-not-call rules; (iii) maintain a list of telephone numbers Defendants may not contact; (iv) employ a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and (v) maintain records documenting this process.

109.     On information and belief, Defendants failed to honor the national do-not-call registry, failed to provide "an interactive opt-out mechanism" by which Plaintiff and the 227(c) Class could opt out of future calls, and failed to maintain an "automated, interactive voice- and/or key press-activated opt-out mechanism" by which Plaintiff and the 227(c) Class could call a separate toll-free number and add their numbers to Defendants' internal do-not-call list.

110.     Defendants' text messages were willful and knowing, in that Defendants knew they were sending advertising and/or telemarketing text messages to the cellular telephone numbers of Plaintiff and the class members registered on the national do-not-call list, but Defendants chose to send such text messages anyway.

111.   "Willful … means that the violator knew that he was doing the act in question. … A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance." *In re Dynasty Mtg., L.L.C.*, 22 FCC Rcd. 9453, 9470 n. 86 (May 14, 2007) (citations omitted).

112.   Because Defendants' misconduct was willful and knowing, the Court should treble the amount of statutory damages recoverable by Plaintiff and the putative Class members.

<u>COUNT IV</u>
**VIOLATIONS OF THE TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(3)**

113.   Plaintiff restates and incorporates by reference all paragraphs of this Complaint, including all subparagraphs thereof.

114.   Defendants' text messages were made for a commercial purpose in that they contain the brand name and location of Shark Bar, they promote specials and events at Shark Bar, and/or they encourage Plaintiff and the putative Class members to visit Shark Bar with their friends or associates.

115.   Defendants sent one or more advertising and/or telemarketing text messages within any twelve-month period to Plaintiff and the 64.1200(d)(3) Class after Defendants had been requested to stop.

116.   As a result of Defendants' conduct and pursuant to Section 227(c)(5) of the TCPA, Plaintiff and the 64.1200(d)(3) Class were harmed and are entitled to $500 in damages for each violation.

117.   Plaintiff and the 64.1200(d)(3) Class are also entitled to an injunction against future calls. 47 U.S.C. § 227(c)(5).

118.   On May 21, 2018, Plaintiff demanded a copy of Defendants' written policies and procedures for ensuring compliance with the TCPA, but Defendants did not respond to Plaintiff's

request.

119.    On information and belief, Defendants failed to institute written procedures, available upon demand, for initiating telemarketing calls, that meet (or exceed) the minimum standards required by 47 C.F.R. § 64.1200(d).

120.    Defendants' text messages were willful and knowing, in that Defendants knew they were sending advertising and/or telemarketing text messages to the cellular telephone numbers of Plaintiff and the Class members after they had been requested to stop, but Defendants chose to send such text messages anyway.

121.    "Willful … means that the violator knew that he was doing the act in question. … A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance." *In re Dynasty Mtg., L.L.C.*, 22 FCC Rcd. 9453, 9470 n. 86 (May 14, 2007) (citations omitted).

122.    Because Defendants' misconduct was willful and knowing, the Court should treble the amount of statutory damages recoverable by Plaintiff and the putative Class members.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff J.T. Hand, individually and on behalf of the above Classes, prays for the following relief:

(a)    An order certifying the Classes as defined above, appointing Plaintiff as the representatives of the Classes, and appointing his counsel as Class Counsel;

(b)    An order declaring that Defendants' actions, as set out above, violate the TCPA;

(c)    An order declaring that the telephone calling equipment used to send the text messages at issue here constitutes an automatic telephone dialing system under the TCPA;

(d)    An injunction requiring Defendants to cease all unlawful text message activities

-29-

and enjoining Defendants from using automated or computerized dialing equipment to place text message calls without consent;

(e) An award of statutory, and treble damages;

(f) An Award of reasonable attorneys' fees and costs; and

(g) Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims that are so triable.

Dated: March 26, 2019                          Respectfully submitted,

                                               /s/ Bill Kenney
                                               William C. Kenney    Mo. Bar No. 63001
                                               **BILL KENNEY LAW FIRM, LLC**
                                               1100 Main Street, Suite 1800
                                               Kansas City, MO 64105
                                               Telephone: (816) 842-2455
                                               Facsimile: (816) 474-8899
                                               Email: *bkenney@billkenneylaw.com*

                                               Eve-Lynn J. Rapp (*pro hac vice*)
                                               Brandt Silver-Korn (*pro hac vice*)
                                               **EDELSON PC**
                                               123 Townsend Street, Suite 100
                                               San Francisco, California 94107
                                               Telephone: (415) 234-5262
                                               Facsimile: (415) 373-9435
                                               Email: *erapp@edelson.com*
                                               *bsilverkorn@edelson.com*

                                               Benjamin Richman (*pro hac vice*)
                                               Sydney Janzen (*pro hac vice*)
                                               Michael Ovca (*pro hac vice*)
                                               **EDELSON PC**
                                               350 North LaSalle Street, 14th Floor
                                               Chicago, Illinois 60654
                                               Telephone: (312) 589-6370
                                               Facsimile: (312) 589-6378
                                               Email: *sjanzen@edelson.com*
                                               *movca@edelson.com*

                                               *Attorneys for Plaintiff and all others*
                                               *similarly situated*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 26, 2019, the foregoing document was electronically filed with the Court's Electronic Filing System and will be served electronically on all registered attorneys of record.

                                               /s/ Bill Kenney
                                               William C. Kenney

-31-